No. 13,806.

CITY OF NEW ORLEANS VS. AUGUST FABER.

SYLLABUS.

1.   The ordinance of the New Orleans City Council, No. 312, N. C. S., adopted under the authority of Act No. 34 of 1900, in prohibiting private markets within thirty-two hundred feet of the public markets, violates none of the provisions of the State or Federal Constitutions, which are here invoked.

2.   It is within the police power and legislative discretion of the City of New Orleans, under said act of the General Assembly, to require certain food com-

City of New Orleans vs. Faber.

modities to be sold only in the public markets, and the fact that the ordinance in question may have the effect of compelling dealers in such commodities to go into the public markets or else to go out of business does not affect the validity of the ordinance.

3.   It is competent for the city, under existing laws, to authorize persons to build markets and to collect the revenues thereof for a fixed period in consideration of their conveying the property to the city—such markets to be under the control of the city and to be, in all respects, governed by the regulations applicable to other public markets.

APPEAL from the Fourth Recorder's Court, City of New Orleans— *Murray, J.*

*Samuel L. Gilmore*, City Attorney, and *H. Garland Dupre*, Assistant City Attorney, for Plaintiff, Appellee.

*E. Howard McCaleb, Emile J. Meral* and *E. Howard McCaleb, Jr.*, for Defendant Appellant.

The opinion of the court was delivered by

MONROE, J.   Defendant, having been charged with the violation of City Ordinance No. 312, New Council Series, undertook to defend himself by setting up the unconstitutionality of the ordinance, and of the law under the authority of which it was adopted; and, having been convicted and sentenced, has appealed directly to this court.   The ordinance in question makes it unlawful for any person "to conduct a private market, or to sell at retail any fresh meat, fresh fish, game, poultry or vegetables, except potatoes and onions, in any building, place, store, or stand, within thirty two hundred feet, walking distance, from any public market, in the City of New Orleans;" prohibits the sale of oysters and groceries in the public markets, and contains some other provisions which need not be specially noticed.   The act of the General Assembly referred to (being Act No. 34 of 1900), authorizes the Council of the City of New Orleans "to pass such ordinances for the government and regulation of private markets, in the City of New Orleans, as they, in their discretion, may deem proper," and to provide for the enforcement of the same, especially authorizing said Council to "prescribe the manner in which such private markets shall be kept, and the distance at which they may be located from all public markets."

There is no dispute as to the facts, and the questions of law which are presented are not unfamiliar to this court.

1. It is said that the defendant had complied with the pre-existing law (Act No. 116 of 1888 and Ordinance No. 7607) and had established his business, in conformity thereto, within the populous district of the city; that he had thereby acquired rights which can not be divested by subsequent legislation; and that, in so far as Act No. 34 of 1900 requires the removal of said business beyond said district, it is unconstitutional. Stated in other words, the proposition is, that because the defendant had established his business in conformity to the law and the ordinances in force prior to the adoption of Act No. 34 of 1900, he had thereby placed said business beyond the reach of the law-making power and had acquired a vested right to conduct the same business, in the same place, and in the same manner, forever. This proposition is untenable, and ignores the very premise upon which it rests. Thus, the defendant had established his business in conformity to Act 116 of 1888 and the city ordinance adopted under its authority. But that legislation was but the reassertion by the State and the city of the power to control, at discretion, the question of the location and regulation of private markets. In 1866 the General Assembly, by Act No. 134 of the session of that year, had authorized the establishment of private markets everywhere, subject to the police ordinances of the city. In 1874, by Act No. 31, private markets were prohibited within twelve squares of the public markets. In 1878, by Act No. 100, they were prohibited "within a radius of six squares" of the public markets. But the use of the word "radius" gave rise to some trouble, as a question of construction, and, in 1888, Act No. 116 was passed, prohibiting private markets "within a walking distance of six blocks from any public market; the said distance to be interpreted as meaning that represented by six blocks in a walk from the public market to a private market." When, therefore, the defendant established his market, agreeably to the provisions of this last mentioned act, and of the ordinance adopted under its authority, he conformed to a law which changed the pre-existing regulations upon the subject, with presumed knowledge of that fact, and of the further fact that the authority to make and unmake such law had always been exercised by the State and city as part of the police power, and had been uniformly recognized and enforced by the courts.

In the case of City of New Orleans et als. vs. Stafford, 27 Ann. 417, it was said:

"There is in the defendant's case no room for any well grounded

complaint of the violation of a vested private right, for the privilege, if he really possessed it, of keeping a private market, was acquired subordinately to the right existing in the sovereign to exercise the police power to regulate the peace and good order of the city, and to provide for, and maintain, its cleanliness and salubrity. * * * We presume that it will not be denied that, under circumstances of peril and emergency, the law-maker would have the right to abolish or suspend an occupation imperiling the public safety. This power is inherent in him. He may exercise it prospectively, for prevention, as well as, *pro re nata,* for immediate effect. It is within his discretion when to exercise this power, and persons under license to pursue such occupation as may, in the public need and interest, be affected by the police power, embark in those occupations subject to the disadvantages which may result from a legal exercise of that power."

See also Morano vs. Mayor *et als.,* 3 La. 219; First Municipality vs. Cutting, 4 Ann. 335; State vs. Gisch, 31 Ann. 544; City vs. Wolf, 36 Ann. 986; State vs. Natal, 38 Ann. 967; State vs. Natal, 39 Ann. 419; Gossig *et als.* vs. City, 41 Ann. 522; State vs. Garibaldi, 44 Ann. 809; Natal vs. State of Louisiana, 139 U. S. 621.

Judge Dillon says, upon this subject: "Many of the powers exercised by municipalities fall within what is known as the *police power* of the State, and are delegated to them to be exercised for the public good. Of this nature is the authority to suppress nuisances, preserve health, prevent fires, to regulate the use and storage of dangerous articles, to establish and control markets and the like * * * every citizen holds his property subject to the proper exercise of this power, either by the State Legislature, directly, or by public or municipal corporations to which the Legislature may delegate it." Dillon on Municipal Corporations (4th Ed.), Vol. 1, § 141.

2. It is urged that Ordinance No. 312 N. C. S. is unconstitutional, in that it deprives the defendant of his liberty and of his property without due process of law. This objection is answered by the opinion of the Supreme Court of the United States in the case of Natal *et als.* vs. State of Louisiana, 139 U. S. 621, as follows, to-wit: "The plaintiffs in error were severally complained of, tried, convicted and sentenced in a Recorder's Court of the City of New Orleans, for keeping a private market, in violation of paragraph 4 of an ordinance of the city, copied in the margin, and passed under the authority conferred by the Statute of Louisiana of 1878, Chapter 100, as follows (quoting the statute):

"The cases were consolidated and on appeal to the Supreme Court of the State the judgments were affirmed (39 La. Ann. 439). The plaintiffs in error contended in the Recorder's Court, and afterwards assigned for error, that their privileges and immunities as citizens of the United States had been abridged, and that they had been deprived of liberty and property without due process of law, and had been denied the equal protection of the law, contrary to the fourteenth amendment of the Constitution of the United States. The case is too plain for discussion. By the laws of Louisiana, as in States where the common law prevails, the regulation and control of markets, for the sale of provisions, including the places and distances from each other at which they may be kept, are matters of municipal police, and may be entrusted by the Legislature to a city council, to be exercised as, in its discretion, the public health and convenience may require. (Citing authorities). The ordinance of the City of New Orleans prohibiting the keeping of a private market within six squares of any public market of the city, under penalty of a fine of twenty-five dollars and of imprisonment of not more than thirty days if the fine is not paid, was within the authority constitutionally conferred upon the City Council by the Legislature of the State. A breach of such an ordinance is one of those petty offenses against municipal regulations, which, in Louisiana, as elsewhere, may be punished by summary proceedings before a magistrate, without trial by jury.  *  *  *  Judgment affirmed."

3. But it is said that the defendant in this case, and others similarly situated, will be compelled to abandon the private market business because the ordinance complained of will force them into the uninhabited sections of the city, where such business will be unprofitable. The Act of 1874, as we have seen, prohibited private markets within twelve squares of the public markets, a greater distance (as compared with a smaller population) than the thirty-two hundred feet prescribed by the present ordinance. The act was, however, held by our predecessors in this court to be constitutional. City vs. Stafford (*supra*). And, if it be true, as was said by the Supreme Court of the United States, in the case cited above, that "the regulation and control of markets for the sale of provisions, including the places and the distances from each other at which they may be kept, are matters of municipal police and may be entrusted by the Legislature to the City Council, to be exercised as, in its discretion, the public health and convenience may require," it is plain that the distance between public and

private markets may as well be fixed at thirty-two hundred feet as at twelve, or nine, or six, squares; and the fact that a particular individual is unable to find a place beyond the prescribed limit within which he can conduct his business profitably does not affect the question, since, in the exercise of the power and discretion vested in it, the Council might, at once, and in direct terms, prohibit the sale of provisions elsewhere than in the public markets. Mr. Tiedman, in a late work entitled "State and Federal Control of Persons and Property," Vol. 1, p. 557, says: "Not only has the Legislature exercised the power of confining the prosecution of certain trades to certain localities, but it has very often, particularly in respect to the vending of fresh meat and vegetables, prohibited the plying of the trade in any other place than the market which is established and regulated by the government. This regulation is very common in all parts of this country, and has frequently been the source of litigation, but it has generally been held to be reasonable."

And he cites a number of authorities in support of the view thus expressed, and quotes *in extenso* from the opinion in "City of New Orleans vs. Stafford," as forcibly presenting the "reasons which justify this police regulation." Judge Dillon writes to the same effect, viz: "The States, under their police power, may delegate to municipal corporations the authority to establish or authorize the establishment of markets, and it is competent to such corporations, under proper grants of power, to enact ordinances prohibiting sales and purchases of marketable articles, except at designated market places. * * * In England, the regulation of markets by by-laws, has long been exercised, and such by-laws are sustained as being reasonable and conducive to the health and good government of the municipality. In this country, the practice is almost universal on the part of the Legislature to confer upon the municipal agencies more or less authority with respect to markets and market places, and such grants are not so strictly construed as those which invest the corporation with a power of a more extraordinary or unusual character; at least such is the case unless a monopoly in favor of private individuals is sought to be sustained, against which the courts strongly lean." Dillon on Municipal Corporations (4th Ed.), Vol. 1, § 1380.

"There can be no doubt," said this court, "that the city, under the legislative permission, can forbid the opening of markets at designated

places, and such forbidding is an exercise of its power to regulate markets." State vs. Gisch, 31 Ann. 544.

4. It is claimed that the ordinance in question unjustly discriminates in favor of certain persons who have obtained contracts to establish markets within thirty-two hundred feet of the public markets. It appears from the record that the city saw proper to arrange for the establishment of markets in a few localities where they were, presumably, needed, by making contracts whereby certain individuals agreed to build such markets and to convey the same, with such ground as they were to be built upon, to the city; and thereafter to maintain such markets, subject to all the regulations applicable to public markets, on condition that in lieu of a sum of money to be paid by the city, in cash, such persons should be allowed to recover the price, or value, of the property by collecting the revenues of the markets, as fixed and regulated by the city, during a certain number of years. In other words, they are lessees who give the property in consideration of their leases instead of paying a fixed amount per annum or a proportion of the revenue. The validity of a contract such as that described has been affirmed by this court in the following terms, to-wit: "A municipal corporation has the power to contract with an individual to authorize him to build a market-house, rent stalls and collect dues during a specified period, with the consideration that the land, which is his property, and the improvements upon it, shall be conveyed to the city, and that the same, at the expiration of the term, shall be turned over, absolutely, in good order, to the corporation. The land and constructions become municipal property at the signing of the contract, and the ownership becomes absolute at the expiration of the time, in the city. The market thus put up is a public market and any private market found within the prohibited distance of six squares from it is there kept in violation of law."

State vs. Natal, 41 Ann. 807; State vs. Gisch, 31 Ann. 544; State vs. Sarradat et als., 46 Ann. 700; State vs. Kientz, 52 Ann. 950.

Judge Dillon refers to the case of LeClaire vs. Davenport, 13 Iowa, 210, in which, overruling Davenport vs. Kelly, 7 Iowa, 102, it was held that a corporation, invested by its charter with power "to erect market-houses, to establish markets and market places, and to provide for the government and regulation thereof," was authorized to pass an ordinance delegating to individuals the right to erect market-houses and to charge rent for the stalls, without reserving to itself the control of the

same, and he dissents from that doctrine. Dillon on Municipal Corporations (4th Ed.), Vol. 1, § 385. But neither he, nor any writer, nor any adjudged case, so far as we are informed, questions the authority of a corporation, having the power to regulate markets, to farm them out, provided the control of the rates charged and of the markets is reserved to the corporation. The counsel for the defendant, in arguing that the provisions of the City Charter of 1870, authorizing the city "to establish markets and to farm out the revenues thereof, have been repealed by the charters of 1882 and 1896, and in referring to the latter acts as governing the validity of the ordinances, which are in evidence, authorizing the building of markets by individuals, have apparently lost sight of the existence of Act 116 of 1888, which they, nevertheless, invoke in behalf of their client, and which does not appear to be in conflict with, and hence does not appear to have been repealed by, either of the acts last above mentioned. State vs. Natal, 39 Ann. 439. The right of the City of New Orleans to farm out the markets has, however, always been recognized as resulting from provisions more general than those contained in the Acts of 1882 and 1896, and, in the case of State vs. Natal, 41 Ann. 887, it was held to have been included among the powers conferred by the charter of 1856 as "necessary for the proper administration of a municipal government."

5. It is said that it is the purpose of the ordinance which is here complained of to force the defendant into one of the markets last above referred to, or into a market operated by the city, in order to create a monopoly in favor of the grantee of such market, or to increase the revenue of such grantee, or of the city.

The answer to this is, that the establishment of public markets and the prohibition of private markets are within the legislative discretion, and the exercise of such discretion can not be inquired into by the courts, unless the law-maker has exceeded his power, or fraud is imputed, or there is a manifest invasion of private right. That neither the State, in the adoption of Act No. 34 of 1900, nor the city, in the adoption of Ordinance No. 312 N. C. S., have exceeded their powers, respectively, is perhaps sufficiently evident from what has already been said and from the authorities cited. More than fifty years ago, Chief Justice Eustis, as the organ of this court, said: "The right to establish markets is a branch of the sovereign power, and the right of regulating them is necessarily a power of municipal police."

Citing Blackstone's Comm., Vol. 1, p. 274; Domat Droit Public Lib. 1, Sec. 3. First Municipality vs. Cutting, 4 Ann. 336.

And, as far back, almost, as our jurisprudence goes, there are reported cases between the City of New Orleans and the farmers of the markets or of the duties imposed upon vendors of provisions. Griffon vs. New Orleans, 5 N. S. 279; Mayor *et als.* vs. Peyroux, 6 N. S. 155.

"But," asks the learned counsel for the defendant, "why is it within the legislative discretion to deal with persons engaged in the lawful business of private market keeping otherwise than with those engaged in any other lawful business, and do we not reach the limit of legislative power before reaching the point at which such business is suppressed?" The answer to this, we think, is also to be found in the authorities cited. There are certain trades and occupations which, for various reasons, by consensus of opinion among all civilized peoples, fall within what is called the "police power," and the reason for their doing so is so deep-seated as to have become a matter of law as well as of fact. Quoting again from an author who has already been referred to, he says, speaking of police regulations: "The instances of this kind of regulation are very numerous. Slaughter-houses have been confined to certain localities; the sale of fresh meat and vegetables has been prohibited, except in the public markets, where the article exposed for sale may be conveniently inspected. In the same way may the manufacture of pressed hay, the maintenance of dairies, the cultivation of land within the limits of a town, and the storage of cotton and of other combustible material, such as oil and gun powder, be prohibited in the densely settled parts of the city, and the prosecution of such trades be confined to less dangerous localities. In the same way, etc., etc."

State and Federal Control, etc., Vol. 2, p. 740.

It follows from this that the question, whether it is advisable, from a sanitary point of view, to restrict the sale of fresh meat and vegetables in New Orleans to markets which are controlled by the government and which are subject to police inspection, is not one which, for the purposes of a case pending in court, can be affected by the opinion of this individual or that one, since, as a matter of law and of settled jurisprudence, it is a question, the determination of which, from the foundation of the State, and under the dominion of seven Constitutions, has uniformly been held to belong to the legislative department of the government. If it were shown, as is claimed by the defendant, that

the purpose and effect of the ordinance under which he is prosecuted is to establish a monopoly, the courts, by the terms of the act authorizing said ordinance, and, under the Constitution, might come to his relief. But the fact that all dealers in the commodities specified in the ordinance may be obliged to transact their business in the public markets is not the establishment of a monopoly within the meaning either of the act in question or of the Constitution, since the markets are open to them all, upon the same terms, and the charges are regulated by law. It might with equal propriety be said that the State or city enjoys a monopoly in exercising any other governmental function, as in the administration of the wharves, or of the system of quarantine, and the claim would be well founded in a limited sense, but not, as we apprehend, in the sense in which the term is used in the argument which we are now considering. How far this court would feel authorized to interfere upon a claim supported by evidence that the revenues derived from the markets are larger than are necessary for their maintenance is a matter which need not be considered, as we find no such evidence in the record.

Judgment affirmed.