## NEW PRYTANIA MARKET ASS'N v. BEOUBAY.*

No. 16973.

Court of Appeal of Louisiana. Orleans.

Jan. 10, 1939.

'Wm. Donnaud, of New Orleans, for appellant.

Jos. M. Jones, Wm. B. Dreux, and Arthur J. Waechter, Jr., all of New Orleans, for appellee.

JANVIER, Judge.

This is a rule for possession of a stall known as No. 9 in the quasi-public New Prytania Market in New Orleans. It is brought by its attorney on behalf of New Prytania Market Association, Inc. In the rule it is stated that the lease under which respondent, Beoubay, occupies the said stall, has expired, and that the said Beoubay has been properly notified to vacate. It is not suggested that he has violated any rule or regulation of the association, nor any sanitary provision or requirement of the Board of Health, nor of any other municipal authority, and, in fact, it is conceded, for the purposes of this case, that there is no reason for Beoubay's ejection other than the desire of the Association to regain possession of the stall and it is stated that the Association desires that the issue be limited to the question of whether it, as a matter of law, has the absolute right, without cause, to refuse to renew, at expiration, the lease of any stall tenant in the said market.

Beoubay, resisting the efforts to eject him, raises several contentions:

(1) That the First City Court, in which the proceeding was initiated, was without jurisdiction ratione materiae.

(2) That the New Prytania Market Association, Inc., has no corporate existence.

(3) That this proceeding was not initiated by a proper officer of the Association.

(4) That the franchise which grants to the New Prytania Market Association, Inc., its rights limits those rights to the collection of revenues from tenants of the market and does not give to it the right to select, nor to eject tenants.

(5) That it would make unconstitutional the ordinance, under which the said market is operated, to interpret it as permitting the Association, without cause, to eject a tenant since he would thus be deprived of his property without due process of law and would be denied the equal pro-

*Rehearing denied Feb. 6, 1939.

tection of the laws and, because there are certain other ordinances which prohibit the operation of private markets within certain specified distances of public and of quasi-public markets, he would thereby be completely prevented from operating in that area.

In the First City Court there was judgment in favor of mover, respondent being ordered to vacate the stall. He has appealed.

The amount involved being less than $100, the matter was placed on what is known as the "de novo" docket of this court for trial before one judge. But the legal questions presented are of such importance that the matter was referred by that judge to the court sitting en banc on an agreed statement of fact, which statement, however, need not be herein incorporated in full.

The New Prytania Market Association, Inc., was incorporated by notarial act on August 7, 1922. The purpose of its creation was the acquisition of the franchise which had been authorized by Ordinance No. 6538 C.C.S. This franchise had been purchased at public auction by Charles F. Buck, Jr., who, with the consent of the City of New Orleans, transferred it and all of his rights thereunder, to the said Association. Under the said ordinance the holder of the franchise agreed to reconstruct and remodel certain buildings located on property belonging to the City of New Orleans and to expend a certain amount thereon and the said ordinance also provided that, immediately upon completion of the work, the buildings should become the property of the City and that, upon expiration of the franchise, they would be turned over to the City. Under the said ordinance the "farmer", as the holder of such a franchise is designated, was given certain rights connected with the operation of such market during the term of the franchise and was required to pay to the City of New Orleans 10 per cent. of the net annual revenues, after deducting all costs and expenses of operation, all of which costs and expenses were first subject to approval by the Commissioner of Public Property.

Just what were the rights of the "farmer" of the franchise under the ordinance, so far as the operation of the market is concerned, is one of the questions involved here. Upon completion of the improvements, tenants were admitted to the said market (the record does not show whether by the City of New Orleans, or by the said Association) and Beoubay later became the tenant of Stall No. 9, but without a written lease, he being required to pay a stipulated amount daily. He has occupied the stall for more than five years and has paid his rent regularly and punctually. The City of New Orleans has adopted ordinances fixing rules and regulations for the operation of such markets and of public markets and has also adopted ordinances—notably Nos. 14075 and 13710 C.C.S.—prohibiting the operation of private markets selling meats and certain other perishable foodstuffs and other commodities within certain designated limits, and has, thus, granted to those who may occupy stalls in such public or in such quasi-public markets the exclusive right to operate such businesses in those designated and limited areas, and it is on this fact that the principal contention of Beoubay is founded.

We first consider the preliminary contentions, any one of which, if well founded, might require dismissal of the rule and thus prevent our giving consideration to the principal question.

Defendant seems to have abandoned the contention that the First City Court was without jurisdiction ratione materiae and, since there is no showing that the amount involved exceeds the maximum jurisdiction of that court, we need say no more concerning that contention.

The second point, that the New Prytania Market Association, Inc., has no corporate existence, is not well founded. The evidence shows that it was incorporated by act passed before Frank W. Magne, Notary Public, on August 7, 1922. Furthermore, since it is shown that respondent leased the stall from the association, he should not now be heard to question its corporate existence.

Respondent next maintains that the proper officer of the Association has not instituted this proceeding. We note that this contention is not based on the fact that there is no allegation to the effect that the proceeding was authorized by resolution of the board of directors, but solely on the fact that the proceeding was not instituted by the proper officer. That a corporation, itself a legal entity, with power to sue and to be sued, need not appear through any particular officer, was held in New Orleans Terminal Company

v. Teller, 113 La. 733, 37 So. 624, 2 Ann. Cas. 127. There an exception "was founded on the fact that neither the name of the president nor of any other officer of plaintiff corporation was stated in the petition, but only that of the corporation was stated." [page 625.] The court, saying that there is a vast difference between the want of authority to bring suit and the failure to declare that a corporation appears through its president, or one of its officers, held that, although an exception based on want of authority to bring suit may be well founded if there is no such authority, the exception based on the fact that no particular officer has been named should not be sustained. The court said: "So long as the suit is duly authorized to be brought, the failure to name the president or other officer is insignificant."

This principle was approved in Layne & Bowler Company v. Town of Winnfield et al., 134 La. 323, 64 So. 127, although there the exception was sustained because it was directed at the absence of authority to bring the suit. It was also followed in Southern Sawmill Company v. Ducote, 120 La. 1052, 1055, 46 So. 20, in which the Supreme Court stated that there is no necessity that any officer of the corporation be designated as appearing on behalf of the corporation. The court said [page 21]: "In such a case the corporation appears through its attorney, who is presumed to have been properly authorized by the corporation to institute the suit."

See, also, Victory Oil Company, Inc., v. Von Schlemmer, 7 La.App. 289, in which this court said: "The jurisprudence is now settled that a 'suit may be brought simply in the name of the corporation without naming its president or other officer.'" See, also, Interstate Trust & Banking Company v. Lichtenteg, 9 La.App. 68, 118 So. 773.

Therefore, since the exception here is directed solely at the fact that the petition does not state that the corporation appears through some designated officer, on the authority of the cited cases this exception is overruled.

Another contention of respondent, which we have numbered 4, is that the rights of the Association are limited to the collection of revenues and that it has no right to select tenants nor to eject them, which latter rights remain in the City of New Orleans, which, respondent contends, should have been a party-plaintiff in this eject-ment proceeding. The theory on which this argument rests is that the ordinance under which the Association is given such rights as it has in connection with the market makes no mention whatever of any right to operate the said market and that, therefore, its sole functions are to make such repairs as may be necessary and to collect the revenues from such tenants as may, by the City, be allowed to occupy the stalls.

■■ We cannot so interpret the ordinance. (No. 6538 C.C.S.) It does, to some extent, seem to indicate that the rights of the Association are limited to the collection of rent monies from the various tenants. But, obviously, it was not the purpose of the framers of the ordinance to so limit those rights. The market system of the City of New Orleans contemplates two kinds of markets: (1) Those wholly public, operated by the City itself, and (2) those quasi-public, which are leased to individuals or associations in accordance with the rules and regulations adopted by the City itself. That the operation of such quasi-public markets is entirely legal and that it is contemplated that the operators, or "farmers", shall have the right to determine what tenants shall occupy stalls, is evident from a reading of the decision of the Supreme Court in City of New Orleans v. Faber, 105 La. 208, 29 So. 507, 53 L.R.A. 165, 83 Am.St.Rep. 232, in which that court said [page 510]: "* * *. It appears from the record that the city saw proper to arrange for the establishment of markets in a few localities where they were presumably needed, by making contracts whereby certain individuals agreed to build such markets and to convey the same, with such ground as they were to be built upon, to the city; and thereafter to maintain such markets, subject to all the regulations applicable to public markets, on condition that, in lieu of a sum of money to be paid by the city, in cash, such persons should be allowed to recover the price or value of the property by collecting the revenues of the markets, as fixed and regulated by the city, during a certain number of years. In other words, they are lessees who give the property in consideration of their leases instead of paying a fixed amount per annum or a proportion of the revenue. The validity of a contract such as that described has been affirmed by this court in the following terms, to wit: 'A municipal corporation has the power to contract with an individual to authorize him to build a market

house, rent stalls and collect dues during a specified period, with the consideration that the land, which is his property, and the improvements upon it, shall be conveyed to the city, and that the same at the expiration of the term shall be turned over, absolutely, in good order, to the corporation. * * *.' "

We call particular attention to the statement that the individual authorized to build such a market-house may "rent stalls". We see no necessity that the City should have been made a party-plaintiff, and we believe that such an association, within constitutional limits, has the right to determine who shall occupy stalls in such a market.

The fundamental question which is presented is whether a corporation operating a quasi-public market may, without assigning any reason, refuse to renew a lease formerly held by a tenant. Let us repeat that the association contends that it need assign no cause—that merely the usual relationship of landlord and tenant exists—and that it need not even declare that it desires to obtain a higher rental for the stall, but that it has the right which any ordinary lessor has—arbitrarily and without cause to notify a tenant that at the expiration of his lease he must vacate.

Beoubay, on the other hand, maintains that, if the ordinance under which the association operates the market be interpreted as giving to the association that right, then it is violative of the Fourteenth Amendment of the Constitution of the United States, U.S.C.A., in that such association would thereby be given the right, at its whim or caprice, to designate and select the tenants who may occupy stalls in such markets and to thus deprive all others of their right to conduct businesses not only therein, but—since other ordinances prevent the operation of private markets within certain designated distances—to also deprive those others of the right to conduct their businesses in those localities, or within those areas, and would thus, without due process of law, deprive them of their property and deny to them the equal protection of the laws.

We must first look at the question of whether the municipality itself, were it operating the market, would have the right, without assigning any cause, to deprive any individual of the right to conduct his business in any particular locality. There is not presented here the question which was involved in the so-called "zoning" cases. We take it that the right of the municipality to prohibit certain kinds of businesses in certain localities exists, as has been universally judicially recognized. But the question here is whether a municipality permitting certain businesses in certain localities may arbitrarily restrict those who may engage in those businesses without establishing rules and regulations and permitting any who may comply with those rules and regulations to conduct such businesses.

The underlying constitutional principle was most interestingly discussed by the Supreme Court of the United States in the noted case, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, in which Mr. Justice Matthews of that court said [page 1071]: "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power. It is, indeed, quite true, that there must always be lodged somewhere, and in some person or body, the authority of final decision; and in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of opinion or by means of the suffrage. But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts bill of rights, the government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any

country where freedom prevails, as being the essence of slavery itself."

The court held that, to permit a municipality, or a board created by a municipality, to fix an arbitrary line, on the one side of which it could place certain persons who might be permitted to conduct their businesses and on the other side of which it could place other persons who might not be permitted to conduct similar businesses, would obviously, without due process of law, deprive those of the one class of their property—their right to engage in business. The court said that the two classes of persons might have everything in common and yet the one would be deprived, without any cause, of its right to conduct the identical business which the other might be permitted to operate. This thought—that it would be unconstitutional to permit a board or a body created by a municipality—even the municipality itself —expressly and without the adoption of a code or set of rules to determine who might and who might not conduct a particular business, has been followed by the Supreme Court of Louisiana in many cases, notably State v. Carter, 159 La. 121, 105 So. 247; City of New Orleans v. Palmisano, 146 La. 518, 83 So. 789; State ex rel. Dickson v. Harrison, 161 La. 218, 108 So. 421. See, also, Hourgette v. City of Gretna, 18 La.App. 336, 137 So. 344.

In State v. Sarradat et al., 46 La.Ann. 700, 15 So. 87, 24 L.R.A. 584, the Supreme Court of Louisiana considered the question of whether or not certain persons might be prevented from conducting their businesses in public market-places. The court said [page 88]: "The market places having for their double purpose the preservation of the public health and the general convenience of the public, all persons who resort to them for the sale of such articles as are required to be sold there must have access to them; the market regulations must be impartial, affording the same rights to all, avoiding the creation of monopolies in one or several persons, * * *".

In City of New Orleans v. Faber, supra, the Supreme Court said: "If it were shown, as is claimed by the defendant, that the purpose and effect of the ordinance under which he is prosecuted is to establish a monoply, the courts, by the terms of the act authorizing said ordinance, and, under the constitution, might come to his relief. But the fact that all dealers in the commodities specified in the ordinance may be obliged to transact their business in the public markets is not the establishment of a monopoly within the meaning either of the act in question or of the constitution, since the markets are open to them all, upon the same terms * * *".

We are of the opinion that, if there were involved here a public market operated by the City itself, the City could not eject a tenant complying with all regulations and regularly paying the stipulated rent, and we must, therefore, consider whether or not the City, by the grant of a franchise, might give to a private corporation, such as the Association involved here, the right to do in a quasi-public market what the City itself could not do in a public market.

There can be no doubt that in certain instances it is necessary that a municipality grant exclusive privileges or franchises and that, where it is in the interest of the general public that there be obtained a certain utility which the municipality is unable itself to provide, a franchise may be granted to an individual or private corporation for the operation of that utility.

Mr. Justice Story, in a dissenting opinion in Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L.Ed. 773, commented upon the fact that, in the United States, wherever an exclusive franchise is given, the first and immediate reaction is to look upon it as unconstitutional, saying [page 606]: "There is great virtue in particular phrases; and when it is once suggested, that a grant is of the nature or tendency of a monopoly, the mind almost instantaneously prepares itself to reject every construction which does not pare it down to the narrowest limits. It is an honest prejudice, which grew up in former times from the gross abuses of the royal prerogatives, to which in America there are no analagous authorities."

But that in many instances it may be necessary to grant an exclusive franchise in order to obtain the utility or the service necessary is now recognized. In 12 Ruling Case Law, page 196, appears the following: "Today, however, opinions are variant upon the question whether, in the case of public utilities, monopolies are, or are not, detrimental to the general good. Perhaps it is the better opinion that where municipal ownership is not feasible or attainable, a properly regulated monopoly is advisable. Of course, the grant, with exclusive privileges, of a right appertaining

to the government, is a very different thing from a grant, with exclusive privileges, of a right to pursue one of the ordinary trades or callings of life, which is a right appertaining solely to the individual. It is the duty of the government to provide suitable roads, bridges, ferries and other utilities for the convenience of the public, and if it chooses to devolve this duty to any extent, or in any locality, upon particular individuals or corporations, it may stipulate for such exclusive privileges connected with the franchise as it may deem proper, without encroachment upon the freedom or the just rights of others. In other words, wherever the object to be attained is a public one, for which the state may make provision by legislative enactment, the grant of the franchise may be accompanied with such exclusive privileges to the grantee, in respect of the subject of the grant, as in the judgment of the legislative department will best promote the public health and the public comfort, or the protection of public and private property. When the public purpose of such grants is apparent the courts as a rule sustain them as in no wise denying to any the equal protection of the laws of violating prohibitions as to the granting to any one of special and exclusive rights or immunities. However, a grant of power to confer a franchise is not necessarily a grant of power to make it exclusive."

We think it clear that, if the City finds it necessary to provide by such method for the establishment of a quasi-public market in a neighborhood which may need a market which the City is unable itself to provide, it may do so by granting the franchise to a private individual, firm or corporation. But it could not grant to such individual, firm or corporation the right to select arbitrarily the tenants who should occupy the stalls in such market because, if it could do so, it could select only persons friendly with its officials and could thus give to those persons the exclusive right to operate in that designated area.

Let us assume that a tenant has built up a large business and has established a valuable good will. If the Association has the right which it contends for, it can entirely destroy that business built up in that particular market and can transfer to some favored tenant that business and a large portion of the good will, which is based somewhat on the location of the business. No such right should exist. As we have said, if there is a necessity for a public market in that locality and the City is unable to provide such market, then we see no reason why the City should not grant a franchise such as it has granted, and that franchise could give to the holder thereof the exclusive right to operate a "quasi-public" market. But it could not give to the operator of the franchise the right to select such persons, firms and corporations as it might wish to select for the occupancy of the stalls of the market. Surely it would not have the right to eject a tenant already in the market, complying with all regulations and regularly paying his rent.

It is true that the question before us is not, strictly speaking, whether Beoubay might have the right, if he were not already the occupant of a stall, by mandamus to force the Association to permit him to occupy a stall, and we do not undertake to pass upon that question. The issue before us is whether he, as a tenant of the New Prytania Market Association, may be forced to vacate.

We realize that the view which we have of this situation seems, to some extent, to interfere with the property rights of the Association and to force that Association to accept a tenant which it does not desire to approve. But, beyond the rights of those involved in this particular case are more important, paramount rights of all citizens to the equal protection of the laws, and a realization of this makes it necessary that we hold that in such quasi-public markets all must be treated equally—all must be given equal rights—and we cannot but feel that, to permit this Association to eject this tenant without assigning any cause, would give to it the right to deprive him of his property without due process of law and to deny to him the equal protection of the laws.

The judgment appealed from is annulled, avoided and reversed, and the rule is dismissed at the cost of mover.

Reversed.